**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SUSAN BALL and JAN WITTERIED, | ) | |
| Administrators of the Estate of Donald Hedstrom, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 08-CV-1613 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| CHERIE KOTTER, THE KOTTER FAMILY | ) | |
| TRUST, and HOPE GELDES, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on cross-motions for summary judgment filed by the parties. Defendant Hope Geldes ("Geldes") and Defendant Cherie Kotter ("Kotter") each moved for summary judgment against Plaintiffs [43, 47]; Plaintiffs have done the same against each Defendant [105, 106]. For the reasons set forth below, Defendant Geldes' motion [43] is granted and Plaintiffs' cross motion against Geldes [106] is denied. Defendant Kotter's motion [47] and Plaintiffs' cross motion against Kotter [105] are both denied.

**I.      Background**

Shortly before his death, Donald Hedstrom ("Hedstrom") purchased two condominiums in Chicago's Lake Point Tower. Kotter (who was Hedstrom's ex-wife and companion at the time of his death) was Hedstrom's real estate agent and Geldes was his real estate attorney for both transactions. Although Hedstrom paid for both of the units, at the closings one of the units was titled to the Kotter Family Trust (of which Kotter is the sole trustee and sole beneficiary) and the other was titled to Hedstrom and Kotter "as joint tenants with right of survivorship." Upon Hedstrom's death, Kotter gained sole ownership of the second unit as well.

Plaintiffs Susan Ball and Jan Witteried, as administrators of Hedstrom's estate, filed a two-count complaint, alleging breach of fiduciary duty by a real estate broker (Count I) and legal malpractice (Count II).[1] Plaintiffs contend that the admissible evidence in this case shows that the properties were titled in a manner contrary to Hedstrom's intent. Plaintiffs argue that Defendant Geldes committed malpractice in her representation of Hedstrom, in part because she failed to disclose that she also represented Kotter in the transactions. Plaintiffs contend that Kotter breached her fiduciary duty to Hedstrom by using her position to personally benefit at Hedstrom's expense. Together, Plaintiffs argue, by breaching their duties to Hedstrom, Defendants deprived the estate of a legal interest in real property worth more than $1 million.

The Court takes the relevant facts primarily from the parties' Local Rule ("L.R.") 56.1 statements.[2] In July of 2006, Hedstrom decided to purchase Unit 4705 and Unit 1518 in Chicago's Lake Point Tower. As stated above, Defendant Kotter was Hedstrom's ex-wife and

---

[1] The lawsuit is in federal court based on diversity jurisdiction, 28 U.S.C. § 1332. [See 135, 136, 137, 138, 139 (clarifying basis for jurisdiction).]

[2] L.R. 56.1 requires that statements of fact contain allegations of material fact, and that the factual allegations be supported by admissible record evidence. See L.R. 56.1; *Malec v. Sanford*, 191 F.R.D. 581, 583-85 (N.D. Ill. 2000). The Seventh Circuit teaches that a district court has broad discretion to require strict compliance with L.R. 56.1. See, *e.g.*, *Koszola v. Bd. of Educ. of the City of Chicago*, 385 F.3d 1104, 1109 (7th Cir. 2004); *Curran v. Kwon*, 153 F.3d 481, 486 (7th Cir. 1998) (citing *Midwest Imports*, *Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995) (collecting cases)). Where a party has offered a legal conclusion or a statement of fact without offering proper evidentiary support, the Court will not consider the statement. See, *e.g.*, *Malec*, 191 F.R.D. at 583. Additionally, where a party improperly denies a statement of fact by failing to provide adequate or proper record support for the denial, the Court deems admitted that statement of fact. See L.R. 56.1(a), (b)(3)(B); see also *Malec*, 191 F.R.D. at 584. The requirements for a response under Local Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted." *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000). In addition, the Court disregards any additional statements of fact contained in a party's response brief but not in its L.R. 56.1(b)(3)(B) statement of additional facts. See, *e.g.*, *Malec*, 191 F.R.D. at 584 (citing *Midwest Imports*, 71 F.3d at 1317). Similarly, the Court disregards a denial that, although supported by admissible record evidence, does more than negate its opponent's fact statement—that is, it is improper for a party to smuggle new facts into its response to a party's 56.1 statements of fact. See, *e.g.*, *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 643 (7th Cir. 2008).

companion at the time of his death, and also served as Hedstrom's real estate agent for the purchase of both of the Units.

On July 26, 2006, Hedstrom retained Defendant Geldes to be his attorney for the purchase of both of the Units. Geldes sent Hedstrom two retainer letters (one for each property), both dated July 26, 2006, which memorialized their relationship and set out the scope of the representation and Geldes' fees. The letters were directed to Hedstrom alone. Hedstrom signed the letters on July 30, 2006 and returned them to Geldes. (Ex. 1 to Affidavit of Hope Geldes, attached to Geldes' memorandum in support of her motion for summary judgment ("Geldes Affidavit") [51]).

During the morning of July 26, Kotter e-mailed Geldes and told her that "He is taking title in another name. He will let me know the proper way to prepare the deed. [...] Don can not hear over a phone so I will be answering all questions for him." (Geldes Response to Plaintiffs' Statement of Additional Facts ("Geldes Resp. Pl. SOAF") [118] at ¶ 1). At around this time, Kotter also told Geldes that Hedstrom would be unavailable during the week of August 1 due to heart surgery that he was undergoing. (*Id*. at ¶ 2).

On July 31, 2006, Geldes sent letters to attorneys for the sellers of both Units. The letters both stated that "at closing, title for the Unit shall be conveyed by warranty deed to Mr. Donald Hedstrom." (Geldes' Response to Plaintiff's Statement of Material Facts ("Geldes Resp. Pl. SOF") [117] at ¶¶ 5, 18). Both Hedstrom and Kotter were copied on the letters via e-mail.[3] The same day, Hedstrom sent a strongly-worded e-mail to Geldes, which stated in part: "I have

---

[3] During discovery, Kotter produced what appeared to be two unsent drafts of these letters. See Exhibits to Plaintiffs' Master Exhibit 4 (Geldes Deposition). The letter regarding Unit 4705 is dated August 1, 2006 and contains a signature in Hedstrom's hand that reads "Donald Hedstrom 8/1/06". The letter reads in part "[a]t closing, title for Unit shall be conveyed by warranty deed to Mr. Donald Hedstrom and Cherie S. Kotter – **jointly (50%-50%)**." *Id*. (emphasis added). The letter is not signed by Geldes; in fact at their depositions both Geldes and Kotter denied ever seeing this version of the letter and denied having authored or seen the "jointly (50%-50%)" language.

written in at least 4 documents that these 2 properties will be jointly owned by Cherie Kotter and me." Hedstrom directed Geldes to "[p]lease comply or I wll [sic] have to get another attorney." (Geldes Affidavit at Ex. 2).

The next day (August 1), Geldes responded to Hedstrom's e-mail, adding Kotter in the "Cc" field. The e-mail explained that "Cherie [Kotter] had asked me to discuss with you both, whether you wanted to own it as joint tenants with right of survivorship, tenants in common or set up a living trust." Kotter responded to Geldes' e-mail a few minutes later, directing Geldes to "put deed to [Unit 4705] in the names of Don C. Hedstrom and Cherie S. Kotter as joint tenants with rights of survivorship." Kotter did *not* include Hedstrom in this response e-mail. (*Id*. at Ex. 4). However, Kotter testified in her deposition that she discussed with Hedstrom how Unit 4705 was to be deeded and that Hedstrom used the specific words "joint tenancy with right of survivorship" to describe how he wanted the property titled between Kotter and himself. (Geldes Resp. Pl. SOF ¶ 10).

Geldes attested that shortly after receiving Kotter's instruction to title Unit 4705 to both Hedstrom and Kotter as joint tenants with the right of survivorship, Geldes had a phone conversation directly with Hedstrom in which she explained the possible title options for the Properties and the legal effect of each. (Geldes Affidavit at ¶¶ 11–15). Hedstrom explicitly told Geldes that he wanted both Properties titled with Kotter and Hedstrom as joint tenants, with a right of survivorship, because he wanted to take care of Kotter and he wanted to ensure that the Properties would pass to Kotter upon his death as he was leaving several other properties that he owned to his children. (*Id*. at ¶ 15).

Later that same day (still August 1), Geldes drafted a revised attorney modification letter to the seller's attorney for Unit 4705. The letter reflected Kotter's instructions in that it stated

that at the closing for Property 4705, the title for the Property "shall be conveyed by warranty deed to **Mr. Donald C. Hedstrom and Ms. Cherie S. Kotter, as joint tenants with right of survivorship**." (*Id*. at Ex. 5) (emphasis in original). Geldes copied both Kotter and Hedstrom by e-mail when she sent the modification letter to the seller's attorney. (*Id*.; Plaintiffs' Amended Response to Defendant Geldes' Statement of Material Facts ("Pl. Resp. Geldes' SOF") [104] at ¶ 13).

Hedstrom, Kotter, and Geldes all attended the closing for Unit 4705. The deed prepared by the seller's attorney for Unit 4705 identified the "Grantees" as Hedstrom and Kotter and it contained four options regarding how the property could be jointly titled to them. (Geldes Affidavit at Ex. 6). Above the four options, the phrase "strike inapplicable" was printed. (*Id*.). At the closing, Kotter and Hedstrom looked on as Geldes drew lines through the options "as tenants in common," "not as tenants in common nor joint tenants, but as tenancy in the entirety," and "statutory fee simple," and handwrote in the phrase "with right of survivorship" after the phrase "not tenants in common but as joint tenants." (Pl. Resp. Geldes' SOF at ¶ 17). Geldes testified that Hedstrom verbally assented to each handwritten change. (Geldes Affidavit at ¶ 18). The deed to Unit 4705 was properly recorded and identified that the title was jointly held by Hedstrom and Kotter, with rights of survivorship.

On August 4, 2006, Geldes sent an attorney modification letter for the other unit, Unit 1518, again copying both Hedstrom and Kotter by e-mail. The letter for Unit 1518 indicated that at the closing "title for Unit shall be conveyed by warranty deed to Mr. Donald Hedstrom and Cherie S. Kotter, as joint tenants with right of survivorship." (*Id*. at Ex. 5). However, shortly before the closing of Property 1518, on September 14, 2006, Kotter sent an e-mail to Geldes informing her that Property 1518 was *not* to be titled jointly, but was to be titled to the Kotter

Family Trust.  (*Id*. at Ex. 7; Pl. Resp. Geldes' SOF at ¶ 21).[4]  Kotter also told Geldes that Hedstrom would be unable to attend the closing for Unit 1518 and requested that Geldes draft a power of attorney giving Kotter power to assign Hedstrom's rights to Unit 1518 to the Kotter Family Trust.  Geldes drafted the power of attorney.[5]  The power of attorney reads in part "[s]uch power shall include *** assigning said property to the Kotter Family Trust *** and giving and granting unto Cherie Kotter, said ATTORNEY, full power and authority to do so." (Ex. 10 to Geldes Affidavit).

Geldes attested that she called Hedstrom to confirm the change of plan and left him a voicemail regarding Kotter's requested change.  (Geldes Affidavit at ¶ 20).  Geldes also faxed Hedstrom a copy of the power of attorney and sent Hedstrom and Kotter an e-mail explaining the effect that the power of attorney would have.  (*Id*.).  The September 18 e-mail reads in part: "The power of attorney assigns the rights under the contract to the Kotter Family Trust.  The Kotter Family Trust will own the property not Don and Cherie as joint tenants."  (*Id*. at Ex. 9). Hedstrom never called Geldes back to confirm the change orally, and he never responded to the e-mail.  However, Hedstrom executed the power of attorney before a witness and a notary public. (Ex. 10 to Geldes Affidavit; Pl. Resp. Geldes' SOF at ¶ 31).  There is no dispute that it is Hedstrom's signature on the power of attorney.  (*Id*.).

Kotter testified that it was Hedstrom's idea for him to assign title to Property 1518 to the Kotter Family Trust because Hedstrom wanted to use the tax savings that would be available to

---

[4] Kotter testified that she was authorized by Hedstrom to communicate this change to Geldes.  (Pl. Resp. Geldes' SOF at ¶ 30).

[5] At certain points prior to the closing for Unit 1518, Geldes also prepared powers of attorney allowing her (Geldes) to act on behalf of Kotter and Hedstrom at the closing for Unit 1518.  Geldes prepared these after Kotter stated she might not be able to attend closing.  However, Kotter did attend the closing and the documents were never executed.

her by doing a Section 1031 exchange with Unit 1518 based upon the sale of some other property owned by the Kotter Family Trust in Indiana. (Pl. Resp. Geldes' SOF at ¶¶ 28, 29; see 26 U.S.C. § 1031). Kotter retained a second lawyer, Mark Ewing, to prepare documents related to the Section 1031 exchange. (Plaintiffs' "Reply" to Geldes Resp. Pl. SOF at ¶ 26).

Kotter and Geldes attended the closing for Unit 1518; Hedstrom did not. At the closing, Unit 1518 was titled to the Kotter Family Trust. Kotter received a real estate brokerage commission for the purchase of the two units and used those commissions to buy furniture and to remodel the units. (Plaintiffs' Response to Kotter's Statement of Additional Material Facts ("Pl. Resp. Kotter SOAF") [94] at ¶ 4).

On November 15, 2006, Hedstrom executed a final will and living trust, which provided in part, "My condominium located at Unit No. 4705, Lake Point Towers, 505 North Lake Shore Drive, Chicago, Illinois 60611, shall be sold by my Trustee." (Geldes Resp. Pl. SOF at ¶ 14). Hedstrom died on January 20, 2007. (Geldes Resp. Pl. SOF at ¶ 16). Plaintiffs' attempt to direct that Unit 4705 be sold was unsuccessful because of Kotter's right of survivorship. Unit 1518 is not referenced in Hedstrom's will or in any of his other estate planning documents.

There are a number of documents which that suggest Geldes represented Kotter as well as Hedstrom in the two condominium purchases. On August 9, 23, and 29 and on September 1, 2006 (before the closing of Unit 1518) Geldes sent letters to sellers' attorneys in which she identified *both* Hedstrom and Kotter as her clients. (Exs. 22, 27 and 28 to Plaintiff's Master Exhibit 2, Deposition of Hope Geldes; Geldes Resp. Pl. SOF at ¶ 23). On January 10, 2007, Geldes sent Kotter (and not Hedstrom) a letter which said "it has been a pleasure to assist you in the purchase of your new home" regarding Unit 1518. (Ex. 43 to Plaintiffs' Master Exhibit 2). On January 16, 2007, Geldes sent a letter to both Hedstrom and Kotter which said "it has been a

pleasure to assist you in the purchase of your new home" regarding Unit 4705. (Ex. 25 to Plaintiffs' Master Exhibit 2). On February 9, 2007, following Hedstrom's death, Kotter called Geldes and asked her to write a letter requesting a copy of Hedstrom's will from another attorney. (Geldes Resp. Pl. SOAF at ¶ 4). In the letter, Geldes clearly identified herself as having represented both Kotter and Hedstrom in the purchase of Unit 4705. Geldes and Kotter each deny that an attorney-client relationship ever existed between them. Geldes and Kotter maintain that Geldes was receiving and effectuating Hedstrom's instructions, as communicated through his agent, Kotter. Geldes states that the above-referenced letters where she refers to Kotter as her client were "unintentional misstatement[s] which arose out of the fact that both Kotter and Hedstrom were to appear on the title" and because "Hedstrom's instructions were coming from both himself and Kotter, his agent." (See, *e.g.* Geldes Resp. Pl. SOF ¶ 22).

There is no evidence or contention in this case that Hedstrom lacked mental capacity, had impaired mental capacity, or was the subject of undue influence at any time. (Pl. Resp. Kotter SOAF at ¶ 1).

## II.     Summary Judgment Standard

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette, Ind.*, 359 F.3d 925, 928 (7th Cir. 2004). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation

marks and citation omitted). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

## III.     Application of the Dead Man's Statute

Before proceeding to analysis of the parties' arguments on the merits, the Court must resolve a dispute about what evidence it may consider in deciding these motions. Plaintiffs argue that certain of Defendants' conversations with Hedstrom should be barred by the Illinois Dead-Man's Statute, 735 ILCS 5/8-201. The statute provides in relevant part:

> In the trial of any action in which any party sues or defends as the representative of a deceased person or person under a legal disability, no adverse party or person directly interested in the action shall be allowed to testify on his or her own behalf to any conversation with the deceased or person under legal disability or to any event which took place in the presence of the deceased or person under legal disability ***.

The purpose of the Dead-Man's Statute is to protect decedents' estates from fraudulent claims and also to equalize the position of the parties with respect to giving testimony. *Gunn v. Sobucki*, 837 N.E.2d 865, 869 (Ill. 2005). The Dead-Man's Statute bars only that evidence which the decedent could have refuted. *Id.* The primary reason for the statutory exception is the

supposed inability of the representative to oppose the statements of the adversary. *Van Meter v. Goldfarb*, 148 N.E. 391, 392 (Ill. 1925). The Illinois Dead-Man's Statute is applicable to determine admissibility of evidence in federal diversity cases where state law supplies the rule of decision. *Lovejoy Electronics*, *Inc. v. O'Berto*, 873 F.2d 1001, 1004 (7th Cir. 1989); Fed. R. Evid. 601.

Defendants seek to avoid the Statute by relying on the first of its three exceptions, which reads:

> If any person testifies on behalf of the representative to any conversation with the deceased or person under legal disability or to any event which took place in the presence of the deceased or person under legal disability, any adverse party or interested person, if otherwise competent, may testify concerning the same conversation or event.

735 ILCS 5/8-201(a).[6] Accordingly, if Plaintiffs have "introduce[d] evidence," *Groce*, 669 N.E.2d at 600, regarding a conversation or event, Defendants may testify concerning the same conversation or event. Defendants argue that the "door has been opened by Plaintiffs in filing the Complaint, which relies heavily upon their conversations with Hedstrom before he died." (Geldes Mem. [51] at 11; see also *id*. at 12 ("because all of the key allegations in the Complaint are based upon conversations with the decedent regarding his alleged intentions for the Properties upon his death, the Dead Man's Act is not applicable to preclude the testimony of Geldes and Kotter regarding their direct communications with Hedstrom about his intentions during the purchase of the Properties.")). In their depositions, Plaintiffs admitted that many of

---

[6] The testimonial prohibition of the Dead-Man's Statute is not limited to trial, and is applicable within the context of a summary judgment proceeding. *Brown*, *Udell and Pomerantz, Ltd. v. Ryan*, 861 N.E.2d 258, 263 (Ill. App. Ct. 1st Dist. 2006); *Groce v. South Chicago Community Hospital*, 669 N.E.2d 596, 600 (Ill. App. Ct. 1st Dist. 1996).

the allegations in the complaint are indeed based (at least partly) on conversations that they had with Hedstrom.  (See i*d*.).[7]

The Court agrees with Plaintiffs and finds that Defendants may not introduce evidence of their conversations with Hedstrom or events at which Hedstrom was present unless and until Plaintiffs introduce testimony concerning the same conversation or event.  In  support  of  their argument that the Dead-Man's Statute is inapplicable, Defendants cite a case, *Zorn v. Zorn*, in which the appellate court interpreted the word "event" as used in the statute broadly, so as to include "all of the connected incidents and conversations leading up to the signing of the deed." 464 N.E.2d 879, 882-83 (Ill. App. Ct. 4th Dist. 1984).  In *Zorn*, a father had deeded the family farm to his children.  After his death, the decedent's wife sought to have the deed declared invalid because it was procured by undue influence or because the decedent was mentally incompetent at the time of the conveyance.  *Id*. at 880-81.  Before trial, the court excluded conversations the defendants had with the decedent under the Dead-Man's Statute.  *Id*.  During trial, plaintiff called an adverse witness and questioned her about the day she drove the decedent to a bank to have the decedent sign the deed.  After this testimony, defendants' counsel argued that the plaintiff had waived the protection of the Dead-Man's Statute and requested that the defendants be allowed to testify about certain conversations they had with the decedent several months prior to the trip in question which would show that the decedent had requested the defendants to act as they had.  The trial court refused to allow such testimony, but the appellate court reversed.  *Id*.  The appellate court found that the "core issue" was the "meaning of 'event'" as used in the Statute.  The court found the term to include "all of the connected incidents and conversations leading up to the signing of the deed" such that the defendants could fully explain

---

[7] Plaintiffs, however, contend that their complaint was based on the entire course of dealings among the parties, including written documents and communications.

and rebut the witness's testimony. *Id.* at 882. Accordingly, when the door is opened on an "event" or conversation, it swings wide.

But Defendants cite no case, nor was the Court's research able to uncover a case, where the mere act of making allegations in a complaint about a certain event or transaction was held to "open the door" to testimony about the adverse party's conversations with the decedent about the entire event or transaction, even if the complaint is based on conversations the plaintiff had with the decedent. First, such an argument runs contrary to the language of the statute itself. The exception provides that if a person "testifies" on behalf of the representative about a conversation or event involving the decedent, the statute's protection is waived as to the same conversation or event. 735 ILCS 5/8-201(a). The natural reading of the word "testify" suggests at least the actual presentation of evidence. Accordingly, one Illinois court noted that in order to waive protection of the statute, the plaintiff would have to "introduce[] evidence at the trial of this action." *Groce*, 669 N.E.2d at 600; see also *Goad v. Evans*, 547 N.E.2d 690, 300 (Ill. App. Ct. 4th Dist. 1989) ("However, subsection (a) permits the decedent's representative to in effect waive the protection of the Dead Man's Act by *presenting evidence* concerning events which occurred in the presence of the decedent.") (emphasis added). Whether a plaintiff can waive protection of the Dead-Man's Statute by submitting evidence at the summary judgment stage (or whether the waiver must occur at trial) is not an issue that the Court must decide, since neither was done here. "[M]ere allegations of a complaint are not evidence." *Tibbs v. City of Chicago*, 469 F.3d 661, 663 n.2 (7th Cir. 2006).

Furthermore, Defendants' reading of the exception on which they rely, if accepted, would so broaden the exception as to render the Dead-Man's Statute meaningless. Many cases brought on behalf of a deceased person arise at least in part from conversations that the decedent had

with his representatives before his death. Plaintiffs are correct when they argue that "if the mere filing of a complaint by a decedent's estate opened the door as a matter of law to decedent's alleged conversations with interested parties in connection with relevant transactions, the Dead Man's Act would be rendered a virtual nullity." [198 at 6].

Accordingly, for the purposes of these motions, the Court will not consider Defendants' testimony regarding conversations that each purportedly had with Hedstrom or events that occurred in his presence. *Judson Atkinson Candies v. Latini-Hohberger Dhimantic*, 529 F.3d 371, 382 (7th Cir. 2008) ("The evidence supporting a factual assertion [in a Local Rule 56.1 Statement] must represent admissible evidence."). Such testimony includes the statements in the Geldes' Affidavit wherein she attests to confirming in an August 1, 2006 phone call that Hedstrom intended to deed Unit 4705 to both Hedstrom and Kotter as joint tenants with the right of survivorship. Similarly, the Court does not consider statements at the closing in which Hedstrom approved the changes to the deed. Kotter's statements that Hedstrom specifically instructed her to tell Geldes to title Unit 4705 as "joint tenancy with right of survivorship" or Kotter's statement that Hedstrom authorized her to communicate to Geldes that Hedstrom wanted Unit 1518 titled in the name of the Kotter Family Trust similarly are barred.

For what it is worth, the Court *does* consider Geldes' statement that on August 4, 2006, she called Hedstrom and left him a voicemail in her attempts to confirm that he intended to title Unit 1518 in the name of the Kotter Family Trust. These attempts to initiate a conversation do not a conversation make, and are not barred by the statute. Were Hedstrom alive, he could not conclusively dispute Geldes's assertion that she called but did not reach him. *Gunn*, 837 N.E.2d at 869 (Dead-Man's Statute bars only that evidence which the decedent could have refuted).

## IV.    Analysis

### A.    Malpractice Claim Against Defendant Geldes

An action for legal malpractice under Illinois law requires the plaintiff to prove five elements: "(1) an attorney-client relationship; (2) a duty arising out of that relationship; (3) a breach of that duty; (4) causation; and (5) actual damages." *Washington Group Intern., Inc. v. Bell, Boyd & Lloyd LLC*, 383 F.3d 633. 636 (7th Cir. 2004) (quoting *Griffin v. Goldenhersh*, 752 N.E.2d 1232, 1238 (Ill. 2001)). "Only when an attorney fails to exercise a reasonable degree of professional care and skill will he be liable to his client." *Sexton v. Smith*, 492 N.E.2d 1284, 1287 (Ill. 1986). In legal malpractice cases "[a]ctual damages are not presumed, and thus the plaintiff must affirmatively plead and prove he suffered injuries resulting from the legal malpractice." *Griffin*, 752 N.E.2d at 1238; see also *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 856 N.E.2d 389, 395 (Ill. 2006).

Both Defendants argue that they are entitled to summary judgment because Plaintiffs have failed to present expert testimony on the applicable standard of care against which their conduct will be measured. *Barth v. Reagan*, 546 N.E.2d 1196, 1200 (Ill. 1990).[8] Under Illinois law, "[f]ailure to present expert testimony is usually fatal to a plaintiff's legal malpractice claim." *Id.* see also *Shanley v. Barnett*, 523 N.E.2d 60, 64 (Ill. App. Ct. 1st Dist. 1988) ("When a

---

[8] Plaintiffs have been precluded from offering expert testimony at trial under Magistrate Judge Valdez's Minute Order of August 12, 2009 [72] refusing to re-open expert discovery. The background and rationale underlying Judge Valdez's ruling are fully discussed in this Court's Memorandum Opinion and Order of November 12, 2009 [85], overruling Plaintiffs' objections to Judge Valdez's ruling. Plaintiffs were required to disclose their experts on or before January 30, 2009. Even months after the deadline had passed, Judge Valdez gave Plaintiffs a number of opportunities to disclose an expert. However, Plaintiffs did not disclose their expert until July 21, 2009, more than two months after Defendants filed motions for summary judgment which argued that the lack of expert testimony was fatal to Plaintiffs' claims. This Court fully considered all of the relevant circumstances, including the prejudice that Defendants would have suffered if Plaintiffs were permitted to re-open expert discovery so late in the game, as well as the discovery violations that Defendants themselves committed and concluded that Judge Valdez's decision was neither clearly erroneous nor contrary to law.

plaintiff [in a legal malpractice action] cannot obtain expert testimony to establish negligence, summary judgment is appropriate."). "The standard recognizes that lay jurors are not equipped to determine what constitutes reasonable care in professional conduct without measuring the actor's conduct against that of other professionals." *Advincula v. United Blood Services*, 678 N.E.2d 1009, 1021 (Ill. 1996) (citing W. Keeton, PROSSER & KEETON ON TORTS § 32 (6th ed. 1995)).

The exception to the requirement for expert testimony is when "the common knowledge or experience of lay persons is extensive enough to recognize or infer negligence from the facts, or where an attorney's negligence is so grossly apparent that a lay person would have no difficulty in appraising it." *Barth*, 546 N.E.2d at 1200; see also *House v. Maddox*, 360 N.E.2d 580, 584 (Ill. App. Ct. 1st Dist. 1977). Illinois courts refer to this as the "common-knowledge" exception. The example that the Illinois Supreme Court gave of an instance when expert testimony would not be needed is when "the attorney's alleged negligent act involved a failure to meet a widely recognized time deadline." *Id.* at 1201. Other Illinois cases applying the exception involve gross and obvious negligence, usually involving failure to meet clear time deadlines. For example, in *House*, 360 N.E.2d at 584, the court applied the "common knowledge" exception where the defendant-attorney had failed to file a claim within the applicable statute of limitations period. Other cases involve similarly obvious negligence. See *Gray v. Hallett*, 525 N.E.2d 89, 91 (Ill. App. Ct. 5th Dist. 1988) (failure to obtain service of process within limitations period); *Sorenson v. Fio Rito*, 413 N.E.2d 47, 53 (1st Dist. 1980) (failure to timely file inheritance and estate tax forms).[9]

---

[9] Federal courts applying Illinois law in malpractice cases have recognized and applied these rules. See, *e.g. Hoagland v. Sandberg*, *Phoenix & Von Gontard*, *P.C.*, 385 F.3d 737, 743 (7th Cir. 2003) ("A suit for legal malpractice under Illinois law *** requires (unless the lawyer's breach of duty is obvious even to a layperson) *** expert testimony regarding the standard of care or loyalty that the lawyer is alleged to

Plaintiffs contend that Geldes breached the duty of due care that she owed to Hedstrom in three ways. (See Cmplt. at ¶¶ 47-62). First, Plaintiffs contend that Geldes represented both Hedstrom and Kotter in the purchase of the Units, that Hedstrom's and Kotter's interests were in conflict, and that Geldes committed malpractice when she failed to disclose or otherwise resolve the conflict. Geldes testified that she did not consider Kotter to be her client, and accordingly felt that there was no conflict to address.

Plaintiffs do not argue that a lay person necessarily would appreciate the grossly negligent character of failing to recognize and resolve a conflict between two clients. Instead, Plaintiffs argue that the exception to the requirement of expert testimony is not limited to a juror's "common knowledge," but rather "expert testimony is not required when the standard of care is found within clearly delineated legal standards," such as statutes or when they "permeate the relevant case law." (Pl. Mem. [93] at 12-13). Plaintiffs contend that because the Rules of Professional Conduct and the controlling case law clearly discuss how an attorney must resolve a conflict when one arises, expert testimony not only would be unnecessary but improper. (*Id*.). In support of this assertion, Plaintiffs cite *Sohaney v. Van Cura*, 607 N.E.2d 253 (Ill. App. Ct. 2nd Dist. 1993), and *LID Associates v. Dolan*, 756 N.E.2d 866 (Ill. App. Ct. 1st Dist. 2001). However, both cases stand only for the proposition that expert testimony is inappropriate when an expert (who purports to testify to the applicable standard of care) actually gives testimony which amounts to "statutory interpretation," "legal conclusions," or the "results of his legal research." *Sohaney*, 607 N.E.2d at 267. Of course, "it is the function of the judge to instruct the jury as to the applicable principles of law, rather than being interpreted by an expert." *LID*

---

have violated.); *Peaceful Family Ltd. Partnership v. Van Hedge Fund Advisors, Inc.*, 2000 WL 1644315, at *2 (N.D. Ill. Oct. 26, 2000).

*Associates*, 756 N.E.2d at 876. *Sohaney* and *LID Associates* speak to when expert testimony is prohibited, not when it is required.

In fact, the standard of care involving an attorney's handling of conflicting interests among clients is not, as the Illinois Supreme Court put it, "as obvious as plaintiff would have us believe." *Barth*, 564 N.E.2d at 1200. Assuming that an attorney-client relationship had in fact developed between Geldes and Kotter (a hotly-disputed question of fact), an expert would be needed to opine at least as to when a reasonably competent attorney would recognize that a conflict existed between clients such that she would know to seek a knowing waiver. In *Barth*, one of the grounds on which the plaintiff's legal malpractice claim rested was her allegation that the attorney had improperly been communicating only with the plaintiff's husband about problems with trust property that plaintiff and her husband held. *Id*. at 1201. The court found that the question of the applicable standard of care in the attorney's professional relationship with plaintiff and her husband "turned on questions of 'conflicting interest,'" and that the finder of fact required expert testimony to guide them in resolving such a claim.

> "Conflicting interest" is the simultaneous adverse representation of multiple clients. (1 R. Mallen & J. Smith, Legal Malpractice § 12.2 (3d ed. 1989).) We view the concerns an attorney has regarding his or her professional responsibilities in this area as being complex (see 107 Ill.2d R. 5-105 (attorney disciplinary rule prohibiting multiple employment if exercise of attorney's judgment on behalf of one client will adversely affect representation of another, but allowing such multiple representation if attorney can adequately represent interests of each client and attorney fully discloses multiple representation to each client); see also 134 Ill.2d R. 1.7), and **we do not find the intricacies of this type of representation to be within the common knowledge of lay persons**.

*Id*. (emphasis added).

Plaintiffs' next theory is that Geldes committed malpractice when she failed to disclose and explain to Hedstrom the legal effect of Kotter's directions with respect to the manner in which title in those units was to be held. After setting aside the testimony barred by the Dead

Man's Act, Geldes' communications with Hedstrom are contained in the letters and e-mails that she directed to him. Viewing these, it is highly likely that Hedstrom knew that Unit 4705 would be titled to both himself and Kotter as "joint tenants with rights of survivorship."[10] However, whether Hedstrom *understood* the meaning of the phrase "with rights of survivorship" is less clear. With regard to Unit 1518, Geldes sent Hedstrom an e-mail before the closing which clearly informed him that if he signed the power of attorney she had prepared "[t]he Kotter Family Trust will own the property not Don and Cherie as joint tenants." Geldes never received an e-mail in response, but did receive the power of attorney, executed before a witness and a notary public. Geldes never spoke to Hedstrom in person or on the phone about how he wanted Unit 1518 to be titled.

Of course attorneys have an obligation to communicate with their clients such that they can make informed and intelligent decisions. See *Rogers v. Robson*, *Masters*, *Ryan*, *Brumund & Belom*, 407 N.E.2d 47, 48-49 (Ill. 1980). However, Illinois law is clear that expert testimony is needed to guide a jury through contours of that obligation. Again, the Illinois Supreme Court's decision in *Barth* is conclusive on the point. With the assistance of the defendant-attorney, a husband and wife put a number of properties into land trusts. 564 N.E.2d at 1197-98. The

---

[10] On the morning of July 31, 2006, Hedstrom was copied by e-mail on Geldes' letter to the seller's counsel in which Geldes indicated that Unit 4705 would be titled to Hedstrom alone. That same day (presumably in response to the letter), Hedstrom e-mailed Geldes and essentially threatened to fire her if she could not comply with his wishes to have the properties be "jointly owned by Cherie Kotter and me." Geldes' response to Hedstrom on August 1 shows that she had presented Hedstrom with the three options of titling the property jointly (joint tenants with right of survivorship, tenants in common, or to put the deed in a living trust). After receiving Kotter's instructions to put the title as "joint tenants with rights of survivorship", Geldes copied Hedstrom via e-mail on another letter to seller's counsel in which it was clearly indicated that title for the Unit "shall be conveyed by warranty deed to Mr. Donald C. Hedstrom and Ms. Cherie S. Kotter, as joint tenants with right of survivorship." There is no dispute that Geldes and Hedstrom had been communicating with each other over e-mail. The evidence suggests that Hedstrom read the e-mail transmittal of the first letter Geldes sent to seller's counsel (and was not shy about voicing his displeasure when his wishes for title were not being followed). Plaintiffs present no evidence that Hedstrom did not receive the second e-mail. See *Laouini v. CLM Freight Lines, Inc.*, 586 F.3d 473, 476 (7th Cir. 2009) (citing *Am. Boat Co. v. Unknown Sunken Barge*, 418 F.3d 910, 914 (8th Cir. 2005) (absent evidence to the contrary, e-mails sent presumed delivered and received)).

plaintiff's husband served as manager of the properties and had the power of direction under the trust agreements. *Id.* After foreclosure actions were filed against a number of properties in the trusts, the attorney handled them and continued his practice of communicating only with the husband. The Illinois Supreme Court held that "[o]n these facts, we cannot say that defendant's failure to directly communicate with plaintiff was negligence so grossly apparent that a lay person would have had no difficulty recognizing it." *Id.* at 1201. Underlying the court's conclusion were two considerations highly relevant to the case at bar. First was the fact that the attorney produced letters addressed to both the plaintiff and her husband concerning the foreclosures. The court found that without expert testimony, a lay person could not know whether sending letters (while not communicating in person or on the phone) satisfied the attorney's obligation to communicate. *Id.* at 1200-1201. Similarly, a jury would need an expert's testimony on the standard of care to ascertain whether Geldes' e-mails to Hedstrom (for example, her September 18 email regarding Unit 1518) satisfied her obligation to communicate with him. Additionally, the *Barth* court recognized that the husband's role as the manager of the land trusts created a fiduciary relationship between the husband and plaintiff under the trust. *Id.* Whether the defendant-attorney was justified in communicating only with the husband was complicated by the fact that the husband was plaintiff's fiduciary with regard to the subject matter of the attorney's representation.

> "We hold that, because the details of [the husband's] duties as related to plaintiff's rights as beneficiary under the trust agreement and Illinois land trust law would not be within the common knowledge of lay persons, expert testimony was required at trial to explain not only the legal relationship that the trust agreement created between plaintiff and her husband, but also how defendant could or should have viewed this relationship when he funneled all the information dealing with the trust properties through [the husband]."

*Id.* at 1201. Whether Geldes was justified in taking instructions from and communicating directly with Kotter (Hedstrom's real estate agent and fiduciary) likewise are details for which expert guidance would be required.

Plaintiffs' third and final argument is that Geldes committed malpractice by failing to recognize the "presumptively fraudulent" nature of the transaction (as it involved a real estate broker both acting as an agent for and benefitting from principal in the transaction) and disclosing the same to Hedstrom. See *Lincoln Cardinal Partners v. Barrick*, 218 Ill. App. 3d 473 (Ill. App. Ct. 4th Dist. 1991). It should be clear from the foregoing analysis that expert testimony is required to prove such a claim. There is no dispute that Geldes knew that: (1) Hedstrom intended Kotter to serve as his real estate agent for the transactions and, (2) that he intended Kotter to have *some* ownership interest in the properties. (Geldes Affidavit at Ex. 2). Knowing that information, what further steps a reasonable attorney must then take to advise a client of the "presumptively fraudulent" nature of the transaction, and the required content of such advisories, clearly lie outside the wheelhouse of a typical lay juror.

For all of these reasons, the absence of expert testimony is fatal to Plaintiffs' claims against Geldes. Accordingly, Defendant Geldes' motion for summary judgment [43] is granted and Plaintiff's cross motion against Geldes [106] is denied.

**B.     Breach of Fiduciary Duty Claim Against Defendant Kotter**

Count I of Plaintiffs' complaint alleges that Defendant Kotter breached the fiduciary duty that she owed Hedstrom as his real estate broker. To succeed on a claim for breach of fiduciary duty, a plaintiff must prove that: (1) a fiduciary duty exists; (2) the fiduciary duty was breached; and (3) damages proximately resulting from that breach. *Neade v. Portes*, 739 N.E.2d 496 (Ill. 2000) (citing *Martin v. Heinold Commodities, Inc.*, 643 N.E.2d 734 (Ill. 1994)); see also

*Autotech Technology Ltd. Partnership v. Automationdirect.com*, 471 F.3d 745, 748 (7th Cir. 2006). A fiduciary relationship imposes a general duty on the fiduciary to refrain from "seeking a selfish benefit during the relationship." *Kurtz v. Solomon*, 656 N.E.2d 184, 191 (Ill. 1995). In a breach of fiduciary duty action, a wrongdoer is liable for the entire amount of the loss occasioned by his or her act. *Toro Petroleum Corp. v. Newell*, 338 N.E.2d 491, 496 (Ill. App. Ct. 1st Dist. 1974). However, plaintiffs must prove that a defendant's actions proximately caused their injuries before they can recover in tort, even in instances of intentional torts where fiduciaries are involved. *Martin*, 163 Ill.2d at 59; see also *Chicago City Bank and Trust Co. v. Lesman*, 542 N.E.2d 824, 826 (Ill. App. Ct. 1st Dist. 1989) (proof that damages resulted from the defendant's breach is an element of the cause of action).

Where a fiduciary relationship exists at the time of the transaction and the real estate broker appears to benefit, the transaction is presumptively fraudulent. *Kirkruff v. Wisegarver*, 697 N.E.2d 406, 411 (Ill. App. Ct. 4th Dist. 1998) (citing *Lestos v. Century 21-New West Realty*, 675 N.E.2d 217, 226 (Ill. App. Ct. 1st Dist. 1996)); see also *Burrows v. Palmer*, 140 N.E.2d 668, 673 (Ill. 1957). This presumption of fraud is not conclusive but "may be rebutted by clear and convincing evidence of good faith, showing that the broker did the following: (1) fully disclosed all relevant information to the principal before entering into the transaction; (2) paid adequate consideration; and (3) provided competent and independent advice to the principal." *Id*.; see also *Burrows*, 140 N.E.2d at 673; *Glass v. Burkett*, 381 N.E.2d 821, 824 (Ill. App. Ct. 5th Dist. 1978).

Essentially, Plaintiffs claim that Kotter misused her position as a real estate agent to arrange for the Units to be titled in a way that was contrary to Hedstrom's wishes and beneficial to her. Kotter does not dispute that she acted as Hedstrom's agent in the transaction and owed a fiduciary duty to Hedstrom to the exclusion of her own personal interest. (Kotter Resp. to Pl.

SOAF [113] at ¶¶ 2, 3). Kotter also cannot dispute that she has benefited from the two transactions in which she served as fiduciary. Accordingly, Plaintiffs contend that a presumption of fraud applies to the transactions and, viewing only the admissible evidence in this case, Kotter cannot rebut that presumption. Kotter submits that she did not breach her duty to Hedstrom and that because the properties were titled in accordance with Hedstrom's wishes, he suffered no damages.

As an initial matter, Kotter echoes and adopts Geldes' arguments that Plaintiffs' failure to present expert testimony on the standard of care for a real estate broker is fatal to their claim. The Court disagrees—Plaintiff's claim for breach of fiduciary duty against Kotter does not fail for want of expert testimony. In all "professional negligence cases" (including cases involving real estate agents) the plaintiff generally bears the burden to establish the standard of care through expert witness testimony. *Advincula*, 678 N.E.2d at 1021; *Sohaney*, 607 N.E.2d at 267-269 (error to bar expert who would have testified with respect to the standard of care for real estate brokers in negligence action). But this is not a negligence case which turns on whether Kotter's performance as a realtor was consistent with the relevant professional standards. Here, the gravamen of Plaintiffs' claim is not that Kotter negligently failed to perform her duties as a real estate agent, but that she intentionally misused her position as a realtor to usurp title to the Units. Kotter cites no case standing for the proposition that expert testimony is required to prove such a theory. [11]

Furthermore, Plaintiffs persuasively argue that expert testimony is not required here because the standards that the jury would apply in determining whether Kotter breached her duty to Hedstrom are clearly established by controlling legal authority. Here, because Kotter was

---

[11] By contrast, whether Geldes breached her duty of care to Hedstrom does turn on whether she complied with relevant professional standards.

Hedstrom's fiduciary and did benefit from the transactions, the law *presumes* that she defrauded her principal. See *e.g. Kirkruff v. Wisegarver*, 697 N.E.2d at 411. Expert testimony is not required to establish a breach that arises, as it does here, as a matter of law.

Moving on to the merits of Plaintiffs' claim against Kotter, the Court finds that unresolved factual disputes preclude summary judgment for either party. Kotter has the opportunity to rebut the presumption of fraud that applies to the transactions by clear and convincing evidence by showing that she (1) fully disclosed all relevant information to the principal before entering into the transaction; (2) paid adequate consideration; and (3) provided competent and independent advice to the principal. *Id.* With regard to the first element, although the Dead-Man's statute will bar Kotter from testifying directly about what she told Hedstrom, after hearing the admissible evidence, a jury could find that Hedstrom intended for the two Units to be titled as they were and understood the ramifications of titling them in such a way. For example, whether the September 18, 2006 e-mail from Geldes to Hedstrom in combination with the language on the face of the signed power of attorney fully apprised Hedstrom of all relevant information regarding the titling of Unit 1518 is a question for the fact finder. With regard to Unit 4705, as noted above, there is evidence in the record which suggests that Hedstrom at least knew that Unit 4705 would be titled to both himself and Kotter "as joint tenants with a right of survivorship." (Geldes Affidavit at Ex. 5). However, on the very same day that Hedstrom received the e-mail which contained the "right of survivorship" language, he signed a draft letter regarding Unit 4705 that reads in part "title for Unit shall be conveyed by warranty deed to Mr. Donald Hedstrom and Cherie S. Kotter – jointly (50%-50%)." Whether, Hedstrom intended for Unit 4705 to be titled with a right of survivorship, and whether Hedstrom understood the import of that instruction are questions for the jury. As Plaintiffs themselves

recognize, "[a]s a general rule, a party's state of mind (such as knowledge or intent) is a question of fact for the factfinder, to be determined after trial." *Lorillard Tobacco Co., Inc. v. A & E Oil, Inc.*, 503 F.3d 588, 594 (7th Cir. 2007).

## III.    Conclusion

For these reasons, Defendant Geldes' motion [43] is granted and Plaintiff's cross motion against Geldes [106] is denied.  Defendant Kotter's motion [47] and Plaintiff's cross motion against Kotter [105] are both denied.

Dated:  October 18, 2010                               _____
                                                       Robert M. Dow, Jr.
                                                       United States District Judge