## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| SUSAN BALL and JAN WITTERIED, | ) | |
| Administrators of the Estate of Donald Hedstrom, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 08-CV-1613 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| CHERIE KOTTER, KOTTER FAMILY | ) | |
| TRUST, and HOPE GELDES, | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiffs Susan Ball and Jan Witteried ("Plaintiffs") sued Defendants Cherie Kotter, the Kotter Family Trust, and Hope Geldes, alleging breach of fiduciary duty by a real estate broker and legal malpractice. In an order entered on October 18, 2010 [141], this Court granted Defendant Geldes's motion for summary judgment and dismissed her from the case. The Court concluded, however, that disputed issues of material fact precluded the entry of summary judgment on Plaintiffs' claim against Defendants Kotter and the Kotter Family Trust (collectively, "Kotter"). Before the Court are cross motions by the remaining parties for reconsideration of the Court's order denying summary judgment as to the claim against Kotter and renewed cross motions for summary judgment [152, 161], as well as the parties' pretrial motions [163, 165-171, 173-74, 176-77]. For the reasons set forth below, the Court grants Kotter's cross motion for reconsideration and for summary judgment [152], denies Plaintiffs' cross motion for reconsideration and for summary judgment [161], and denies the parties' pretrial motions [163, 165-171, 173-74, 176-77] as moot.

I.     **Background**

A.     **Factual Background[1]**

In July of 2006, Donald Hedstrom decided to purchase two condominium units in Lake Point Tower in Chicago, Illinois – units 4705 and 1518. Cherie Kotter, Hedstrom's ex-wife and his companion at the time of his death, was his real estate agent for both transactions. Hedstrom also retained attorney Hope Geldes to represent him in both transactions.

On July 26, 2006, in response to Geldes's attempts to reach Hedstrom, Kotter wrote Geldes an e-mail in which she stated that Hedstrom would be taking title to the two units "in another name," and that he would let Kotter know the proper way to prepare the deed. In this e-mail, Kotter stated that Hedstrom "cannot hear over a phone so I will be answering all questions for him." (Geldes Resp. to Pls' SOF ¶ 4.)

On July 31, 2006, Geldes sent a contract modification letter to the attorney of the seller of unit 4705. In her letter, Geldes wrote that "[a]t closing, title for Unit shall be conveyed by warranty deed to Mr. Donald Hedstrom." (Geldes Resp. to Pls' SOF ¶ 5.) Geldes sent a similar letter to the attorney for the seller of unit 1518, also stating that "[a]t closing, title for Unit shall be conveyed by warranty deed to Mr. Donald Hedstrom." (Pls' Resp. to Geldes Mot. for Summary Judgment, Ex. 2.) Geldes sent a copy of both letters to Kotter and Hedstrom by e-mail.

In response to the modification letters, Hedstrom sent Geldes a strongly-worded e-mail instructing Geldes to title both units in his and Kotter's names jointly. Hedstrom stated that he

---

[1] The Court takes the relevant facts from the parties' Local Rule 56.1 statements of undisputed material facts and responses thereto [46, 94, 100, 104, 107, 113, 117, 118, 125]. Because Kotter adopted Geldes's statement of material facts, as well as Geldes's responses to Plaintiffs' statement of material facts, many of the citations here are from those documents.

had written in at least four different documents that the two units would be jointly owned by Kotter and himself. If Geldes refused to title the units according to his instructions, Hedstrom stated, he would have to find another lawyer. On August 1, 2006, Geldes responded to Hedstrom's e-mail with an e-mail of her own, sent to both Hedstrom and Kotter. In this e-mail, Geldes stated that Kotter had asked Geldes to discuss with Kotter and Hedstrom the options for taking title jointly, including owning as joint tenants with right of survivorship, tenants in common, or setting up a living trust. Shortly thereafter, Kotter e-mailed Geldes directly – without including Hedstrom – and stated that unit 4705 was to be titled to Hedstrom and Kotter as "joint tenants with rights of survivorship." (Pls' Amend. Resp. to Geldes SOF ¶ 12.) That same day, Geldes sent a revised modification letter to the seller's attorney for unit 4705 in which Geldes stated that, "[a]t closing, title for Unit shall be conveyed by warranty deed to Mr. Donald C. Hedstrom and Ms. Cherie S. Kotter, as joint tenants with right of survivorship." (Pls' Amend. Resp. to Geldes SOF ¶ 13.)[2] Again, Geldes sent a copy of the letter to Hedstrom and Kotter by e-mail.

Geldes testified that at some point after she sent the revised modification letter, she had a telephone conversation with Hedstrom directly, during which she explained the possible title options for the two units and the legal effect of each option. According to Geldes, during this conversation, Hedstrom explicitly told Geldes that he wanted both units titled with Kotter and Hedstrom as joint tenants, with a right of survivorship. Geldes testified that Hedstrom said that he wanted the units titled in this way because he wanted to take care of Kotter and he wanted to

---

[2] At some point, Hedstrom also signed a draft modification letter for unit 4705 that stated that the unit was to be taken "jointly (50%-50%)." (Geldes Resp. to Pls' SOF ¶ 7.) Plaintiffs do not suggest, however, that this letter was ever sent to the seller's attorney.

ensure that the two units would pass to Kotter upon his death as he was leaving several other properties that he owned to his children. (Pls' Amend. Resp. to Geldes's SOF ¶ 15.) Plaintiffs object to all of this testimony based on the Illinois Dead-Man's Act, and claim that it directly conflicts with the disposition of unit 4705 in Hedstrom's will.

Geldes, Kotter, and Hedstrom all attended the closing for unit 4705. The deed for the unit, as prepared by the seller's attorney, identified the "Grantee[s]" as Hedstrom and Kotter, and it listed four options as to how the unit could be jointly titled to them. (Pls' Amend. Resp. to Geldes SOF ¶ 16.) Following the deed's instructions to "Strike Inapplicable," Geldes drew lines through the options "as tenants in common," "not as tenants in common nor joint tenants, but as tenancy in the entirety," and "statutory fee simple," and handwrote in the phrase "with right of survivorship" after the phrase "not tenants in common but as joint tenants." (Pls' Amend. Resp. to Geldes SOF ¶ 17.) Although Plaintiffs' object to this testimony based on the Illinois Dead-Man's Act, Geldes testified that she made the changes to the deed in front of Kotter and Hedstrom, and that Hedstrom verbally assented to the handwritten changes as they were being made. (Pls' Amend. Resp. to Geldes's SOF ¶ 18.) The deed was recorded and identified the title as jointly held with rights of survivorship.

The titling of unit 1518 was more complex. On August 4, 2006, Geldes sent a revised modification letter to the seller's attorney, this time stating that, "[a]t closing, title for Unit shall be conveyed by warranty deed to Mr. Donald Hedstrom and Cherie S. Kotter, as joint tenants with right of survivorship." (Pls' Amend. Resp. to Geldes SOF ¶ 20.) Geldes sent a copy of this letter by e-mail to both Hedstrom and Kotter. On September 13, 2006, however, Kotter e-mailed

4

Geldes instructing her that unit 1518 was to be titled to the Kotter Family Trust dated September 25, 1993. Kotter is the sole trustee and sole settlor of the Kotter Family Trust.[3]

Geldes then prepared a power of attorney for Hedstrom to sign, with Kotter acting on his behalf.[4] The power of attorney stated that the power Hedstrom was giving to Kotter included "assigning [unit 1518] to the Kotter Family Trust dated September 25, 1993." (Pls' Resp. to Geldes Mot. for Summary Judgment, Ex. 2.) Geldes sent this version to Hedstrom by both e-mail and fax. In her e-mail to Hedstrom to which she attached the power of attorney, Geldes stated that, "[t]he power of attorney assigns the rights under the contract to the Kotter Family Trust. The Kotter Family Trust will own the property not Don and Cherie as joint tenants." (Pls' Resp. to Geldes Mot. for Summary Judgment, Ex. 2.) Geldes called Hedstrom to confirm the change in the title for unit 1518 and left a voice message, but she never spoke to him about it directly.

Hedstrom signed the power of attorney, had it notarized, and it was faxed back to Geldes. As planned, Kotter attended the closing for unit 1518 and acted on Hedstrom's behalf. Unit 1518 was titled to the Kotter Family Trust dated September 25, 1993, and was properly recorded.

---

[3] Although Kotter testified that it was Hedstrom's idea to title unit 1518 to the Kotter Family Trust for tax reasons and that he had authorized her to communicate this change to Geldes, the Court has barred this testimony under the Illinois Dead-Man's Act. Neither of the parties questions this decision in their motions for reconsideration and renewed cross motions for summary judgment.

[4] As the Court pointed out in its October 18, 2010 order, at certain points before the closing for unit 1518, Geldes also prepared powers of attorney allowing Geldes to act on behalf of Kotter and Hedstrom at the closing for the unit. Geldes prepared these after Kotter stated that she might not be able to attend the closing. Once it was clear that Kotter would attend the closing for unit 1518, the only power of attorney necessary was the one for Hedstrom to sign, with Kotter acting on his behalf, and the others were never executed.

Kotter received a commission on the sale of both of the units and used the commissions to buy furniture and to remodel the units. Neither party asserts that Hedstrom lacked mental capacity, had impaired mental capacity, or was the subject of undue influence at any time. Further, Hedstrom had known for years that Kotter was a real estate agent.

On November 15, 2006, after he had closed on both units, Hedstrom executed a final will and living trust, which provided in part, "My condominium located at Unit No. 4705, Lake Point Towers, 505 North Lake Shore Drive, Chicago, Illinois 60611, shall be sold by my Trustee." (Geldes Resp. to Pls' SOF ¶ 14.) Unit 1518 is not referenced in Hedstrom's will or in any of his other estate planning documents. Upon Hedstrom's death, Plaintiffs attempted to sell unit 4705 as instructed in the will, but they were unsuccessful because of Kotter's claim to the property as Hedstrom's survivor.

### B.     Procedural Background

On March 19, 2008, Plaintiffs, Hedstrom's daughters and the administrators of his estate, sued Geldes and Kotter, alleging attorney malpractice and breach of fiduciary duty, respectively. Specifically as to Kotter, Plaintiffs assert that: (1) as Hedstrom's real estate broker, Kotter had a fiduciary duty to represent the interests of her client, (2) Kotter breached her fiduciary duty by using her position as a broker to take title to units 4705 and 1518 in her name and in the name of the Kotter Family Trust, and (3) as a result of the breach, she deprived Hedstrom's estate of a legal interest in property worth more than $1 million. Plaintiffs contend that the admissible evidence in this case shows that the units were titled in a manner contrary to Hedstrom's intent.

On October 18, 2010, the Court ruled on the parties' cross motions for summary judgment. [See 141.] Before it reached the merits of the parties' motions, the Court determined that the Illinois Dead-Man's Act barred evidence of conversations that Geldes and Kotter had

6

with Hedstrom or events at which Hedstrom was present unless and until Plaintiffs introduce testimony concerning the same conversation or event. [141 at 11, 13.] Accordingly, in ruling on the parties' motions, the Court did not consider (1) Geldes's testimony that she confirmed in an August 1, 2006 phone conversation that Hedstrom intended to deed unit 4705 to both Hedstrom and Kotter as joint tenants with the right of survivorship, (2) his reasons for doing so, (3) or statements at the closing during which Hedstrom approved the changes to the deed. Nor did the Court consider Kotter's statements that (1) Hedstrom specifically instructed her to tell Geldes to title unit 4705 as "joint tenancy with right of survivorship," and (2) Hedstrom authorized her to communicate to Geldes that Hedstrom wanted unit 1518 to be titled in the name of the Kotter Family Trust.

The Court then granted Geldes's cross motion for summary judgment and denied Plaintiffs' cross motion against Geldes. [141 at 20.] The Court found that the absence in the record of expert testimony was fatal to Plaintiffs' claim against Geldes, and dismissed her from the case. As to Plaintiffs' claims against Kotter, the Court first determined that because Kotter was a self-interested fiduciary in the real estate deals, a presumption of fraud exists. The Court pointed out that the presumption is not conclusive and "may be rebutted by clear and convincing evidence of good faith," see *Kirkruff v. Wisegarver*, 697 N.E.2d 406, 411 (Ill. App. 4th Dist. 1998), but it concluded that unresolved factual disputes precluded summary judgment for either party. [141 at 23.]

In its order, the Court did not address how its grant of summary judgment in Geldes's favor affected the admissibility of Geldes's testimony under the Dead-Man's Act as to Plaintiffs' claim against Kotter. Nor did Kotter argue in her summary judgment filings that, notwithstanding the Dead-Man's Act, Geldes should be allowed to testify as to the

communications that she had with Hedstrom because she was not directly interested in Plaintiffs' claims against Kotter.

Having ruled on the parties' cross motions for summary judgment, the Court set this case for trial on October 5, 2011. In February of 2011, Kotter's counsel passed away. In June of 2011, new counsel filed an appearance on Kotter's behalf and, shortly thereafter, filed a motion for reconsideration of the Court's October 18, 2010 order. The Court allowed Kotter's motion over Plaintiffs' motion to strike, concluding that even though Kotter's motion was late, it was preferable to determine whether the issues that Kotter raised were dispositive before, rather than after, trial. [See 157.]

In her motion, Kotter makes three arguments. First, she contends that now that Geldes has been dismissed from this case, Geldes no longer is an adverse party and has no direct interest in the outcome of the case. As such, Kotter argues, Geldes's testimony of conversations that she had with Hedstrom are not precluded under the Illinois Dead-Man's Act. According to Kotter, the addition of this evidence is enough to overcome the presumption of fraud and leaves the Court with no option but to grant summary judgment in her favor. Kotter also contends that the Court improperly found that the presumption of fraud applies here at all. According to Kotter, because her position as a real estate broker in the two deals did not affect how the units were eventually titled, she did not benefit from the deals by virtue of her fiduciary status. Finally, Kotter argues that the presumption of donative intent attendant to the creation of a joint tenancy with right of survivorship works to either (1) cancel out the presumption of fraud here, particularly to unit 4705, or (2) supply the "consideration" necessary to overcome the presumption of fraud.

8

Plaintiffs then filed their own motion for reconsideration of the Court's October 18, 2010 order and a renewed cross motion for summary judgment. It their motion, Plaintiffs argue that although the Court properly acknowledged that the presumption of fraud applied in this case, it failed to "view the evidence presented through the prism of the substantive evidentiary burden." *Ass'n Benefit Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841 (7th Cir. 2007). If the Court had properly viewed the evidence, Plaintiffs' contend, it would have found that no reasonable jury could determine that Kotter had met her burden in this case. In short, neither party thinks the case should proceed to trial, but they disagree on who should win on summary judgment.

## II.     Standard of Review

### A.     Motion for Reconsideration

Because the Court's October 18, 2010 order did not dispose of this case in its entirety, the Court reviews the parties' motions for reconsideration under Federal Rule of Civil Procedure 54(b), which states in relevant part: "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Under Rule 54(b), the Court may exercise its inherent authority to reconsider its interlocutory orders because such orders may be revised at any time before the Court enters a final judgment. *See Moses H. Cone Mem. Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 12 (1983) (stating that "every order short of a final decree is subject to reopening at the discretion of the district judge").

This applies to the denial of summary judgment. *Whitford v. Boglino*, 63 F.3d 527, 530 (7th Cir. 1995) (noting that the denial of summary judgment is not a final judgment, but an

interlocutory order). The Court "may, in its discretion, allow a party to renew a previously denied summary judgment motion or file successive motions, particularly if good reasons exist." *Id.* A renewed or successive summary judgment motion is particularly appropriate under the following circumstances: "'(1) an intervening change in controlling law; (2) the availability of new evidence or an expanded factual record; and (3) need to correct a clear error or prevent manifest injustice.'" *Id.* (quoting *Kern-Tulare Water Dist. v. City of Bakersfield*, 634 F. Supp. 656, 665 (E.D. Cal. 1986)). "Although it is desirable for defendants to present their strongest arguments in their initial summary judgment motion," the Court may reconsider a previously denied motion for summary judgment even in the absence of new material. *Whitford*, 63 F.3d at 530. As noted above, the Court exercised its discretion to permit essentially a second round of summary judgment briefing from both sides to determine whether there in fact would be a triable issue of fact for a jury to decide.

### B.     Motion for Summary Judgment

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On cross motions for summary judgment, the Court construes all facts and inferences "in favor of the party against whom the motion under consideration is made." *In re United Air Lines, Inc.*, 453 F.3d 463, 468 (7th Cir. 2006) (quoting *Kort v. Diversified Collection Servs., Inc.*, 394 F.3d 530, 536 (7th Cir. 2005)); see also *Gross v. PPG Indus., Inc.*, 636 F.3d 884, 888 (7th Cir. 2011); *Foley v. City of Lafayette, Ind.*, 359 F.3d 925, 928 (7th Cir. 2004). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted).

10

A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the opposing] position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." *Anderson*, 477 U.S. at 252.

III.    **Analysis**

   A.    **The Illinois Dead-Man's Act**

Kotter first argues that because the Court granted summary judgment on Plaintiffs' only count against Geldes, Geldes is no longer an adverse or directly interested party in this case. Accordingly, Kotter contends, Geldes's testimony as to Geldes's conversations with Hedstrom or events that occurred in his presence is not barred under the Illinois Dead-Man's Act, 735 ILCS 5/8-201.[5]

The Illinois Dead-Man's Act provides in relevant part:

> In the trial of any action in which any party sues or defends as the representative of a deceased person or person under a legal disability, no adverse party or person

---

[5] As previously noted, the Court did not address in its October 18, 2010 order the impact that a grant of summary judgment in Geldes's favor would have on the admissibility of Geldes's testimony as to Plaintiffs' claim against Kotter. Neither party raised the issue, nor did the Court spot it at that time.

directly interested in the action shall be allowed to testify on his or her own behalf to any conversation with the deceased or person under legal disability or to any event which took place in the presence of the deceased or person under legal disability ***.

735 ILCS 5/8-201.[6]   The Act serves two purposes:  (1) to protect decedents' estates from fraudulent claims, and (2) to equalize the position of the parties with respect to giving testimony. See *Gunn v. Sobucki*, 837 N.E.2d 865, 869 (Ill. 2005).  The idea is that because the decedent is unable to testify about an event, "fairness dictates that an adverse party also be unable to testify" as to that event.  *Id.* at 870.  In that vein, the Act bars only evidence that the decedent could have refuted.  *Id.* at 869.

The Act specifically prohibits an "<u>adverse party</u> or person <u>directly interested</u> in the action" from testifying "on his or her own behalf * * *."  735 ILCS 5/8-201 (emphasis added). In determining whether a party is an "adverse party" under the Act, Illinois courts look to the actual interests of the party, not at his or her formal designation as a party.  See, *e.g.*, *Herron v. Underwood*, 503 N.E.2d 1111, 1117 (Ill. App. 5th Dist. 1987) (concluding that a named party-defendant was not an "adverse party" as defined in the Act because she did not have any actual interest in the outcome of the case); *In re Hill*, 411 N.E.2d 77, 80 (Ill. App. 5th Dist. 1980) (holding that the Dead-Man's Act barred the court's consideration of one party's testimony as to his own claim against the estate, but not as to his brother's claim against the estate).  "The question in every case is whether the testimony of the party-witness will be of benefit to him or her against the protected party."  *Herron*, 503 N.E.2d at 117.

---

[6] The Act applies to summary judgment proceedings, *Brown, Udell and Pomerantz, Ltd v. Ryan*, 861 N.E.2d 258, 262 (Ill. App. 1st Dist. 2006), and in federal diversity cases where state law supplies the rule of decision.  *Lovejoy Electronics, Inc. v. O'Berto*, 873 F.2d 1001, 1004 (7th Cir. 1989); Fed. R. Evid. 601.

Now that the Court has granted summary judgment in Geldes's favor on the only count against her, Geldes is no longer an adverse party under the Act and the Illinois case law construing it.[7] When Geldes was a party to the case, her testimony was being offered, at least in part, to protect herself from liability. Now, Geldes's testimony is only being offered in Kotter's defense. Thus, Geldes's testimony as to her conversations with Hedstrom does not benefit Geldes over the protected party – here, Plaintiffs. See *Herron*, 503 N.E.2d at 117. That is enough to keep her from being an adverse party in this case.

Plaintiffs argue that because the Court has not yet entered judgment in Geldes's favor, she technically remains a party to this case and therefore still an "adverse party" under the Act. It is true that without a judgment order, the Court's October 18, 2010 order dismissing Geldes from the case is not yet a final, appealable order. See Fed. R. Civ. P. 54(b). As set forth above, because the Court's order adjudicated "the rights and liabilities of fewer than all the parties," the case is not over as to any of the parties – including Geldes – and "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." *Id.* Nevertheless, having reviewed its prior rulings as to Plaintiffs' claims against Geldes, the Court concludes that the standard for reconsideration is very unlikely to be met as to the Court's summary judgment ruling on that claim.

Furthermore, and more significantly, in determining whether a witness is an "adverse party" under the Illinois Dead-Man's Act, what matters is the witness's actual interest in the case, not her formal designation as a party. See *Herron*, 503 N.E.2d at 1117; see also *Sankey v.*

---

[7] The Court observes that, based on its review of the pertinent case law construing the phrase "adverse party or person directly interested in the action," the Illinois courts have construed that phrase more narrowly than the Court might have anticipated or recognized at the time of its earlier summary judgment rulings.

*Interstate Dispatch*, 90 N.E.2d 265, 267 (Ill. App. 1st Dist. 1950) (concluding that despite the fact that judgment had not been entered against a particular witness – who was a named party, but who had not been served or appeared in the case – the witness was not a "party" to the case as contemplated by the Act because he "could not control the proceedings in any way").  Thus, although the historic federal policy against piecemeal appeals has counseled against the Court entering judgment in Geldes's favor even though the Court granted summary judgment on Plaintiffs' only claim against her, the Court's determination as to Geldes is "'final' in the sense that it is 'an ultimate disposition of an individual claim entered in the course of a multiple claims action.'"  See *General Ins. Co. of Am. v. Clark Mall Corp.*, 644 F.3d 375, 379 (7th Cir. 2011) (quoting *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 7 (1980)).  For all of these reasons, Plaintiffs' case against Geldes is over as a practical matter, and because Geldes's testimony is no longer being offered to protect herself from liability at the expense of Plaintiffs, she is not an "adverse party" under the Act.

A non-party witness's testimony also may be barred under the Act if that person is deemed "directly interested in the action."  735 ILCS 5/8-201.  To disqualify a witness as "directly interested in the action," the witness's "interest in the judgment must be such that a pecuniary gain or loss will come to the witness *directly* as the immediate result of the judgment." *Michalski v. Chicago Title & Trust Co.*, 365 N.E.2d 654, 657 (Ill. App. 3d Dist. 1977) (emphasis added); see also *People v. $5,608 U.S. Currency*, 835 N.E.2d 920, 924 (Ill. App. 2d Dist. 2005) ("A person is interested under the Dead-Man's Act if he or she will directly experience a monetary gain or loss as an immediate result of the judgment.").  Here, Geldes has no "direct, certain and pecuniary" interest in the judgment on Plaintiffs' claim against Kotter.  For the reasons outlined above, Geldes does have an interest in the entry of a final judgment in this case.

But whether judgment is entered in Kotter's favor or in Plaintiffs' favor does not affect Geldes in a direct, pecuniary way any more so than would be the case for an attorney who had not yet been sued but had notified his insurance company of a possible malpractice claim, see *Michalski*, 365 N.E.2d at 656-57 (attorney found competent to testify because his interest in the proceedings was "remote"), or an attorney who had been sued for malpractice in a separate case.  See *Estate of Hurst v. Hurst*, 769 N.E.2d 55, 63 (Ill. App. 4th Dist. 2002) (attorney found competent to testify because he did not stand "to benefit directly from the outcome of the case in which he testified").

Nor does the manner in which the parties are arguing the case give Geldes more than an indirect reputational or emotional interest in the judgment as to Plaintiffs' claim against Kotter. Kotter now argues that she "benefited, not because of what she did to help Hedstrom purchase condo unit 4705, but because of what Hope Geldes did in titling condo unit 4705," (Def. Resp. to Pls' Mot. for Reconsideration), and Plaintiffs respond that "Ms. Geldes' advice was neither competent nor complete."  (Pls' Reply.)  Nevertheless, any emotional or reputational interest that Geldes may have remaining in the case is not enough to affect her competency to testify.  See *Herron*, 503 N.E.2d at 1118 ("Any such 'emotional interest' on the part of [the witness], while bearing on her credibility as a witness, would not bar her testimony under the Dead Man's Act, as it is settled that a disqualifying interest must be of a pecuniary nature."); *Michalski*, 365 N.E.2d at 657 (stating that a witness's indirect interest in a suit may go to the credibility of her testimony, but not to her competency); *Bernardi v. Chicago Steel Container Corp.*, 543 N.E.2d 1004, 1010 (Ill. App. 1st Dist. 1989) ("If the testimony of the witness does not show direct, certain and immediate pecuniary interest, the witness' interest, if any, goes merely to his or her credibility and not to his or her competency to testify.").

15

In the end, the Dead-Man's Act is intended to "remove the temptation of a survivor to testify to matters that cannot be rebutted," not to disadvantage the living. *Balma v. Henry*, 935 N.E.2d 1204, 1209 (Ill. App. 2d Dist. 2010) (citing *Hoem v. Zia*, 636 N.E.2d 479, 483 (Ill. 1994)). Because, under the changed circumstances of this case, Geldes is no longer an adverse or directly interested party, she is competent to testify to the conversations that she had with Hedstrom and events that occurred in his presence. Thus, when ruling on the parties' renewed cross motions for summary judgment, the Court will take into account the following facts:

- Geldes testified that at some point after she sent to the seller's attorney, Kotter, and Hedstrom the modification letter that indicated that unit 4705 would be conveyed to Hedstrom and Kotter as joint tenants with right of survivorship, Geldes had a conversation with Hedstrom directly, in which she explained the possible title options for the two units and the legal implications of each. (Pls' Amend. Resp. to Geldes's SOF ¶¶ 13-14.)

- According to Geldes, during this conversation, Hedstrom told Geldes that he wanted both units titled with Kotter and Hedstrom as joint tenants, with a right of survivorship. (Pls' Amend. Resp. to Geldes's SOF ¶ 15.)

- Hedstrom told Geldes that he wanted the units titled in this way because he wanted to take care of Kotter and he wanted to ensure that the two units would pass to Kotter upon his death as he was leaving several other properties he owned to his children. (Pls' Amend. Resp. to Geldes's SOF ¶ 15.)

- Geldes testified that at the closing for unit 4705, she made the changes to the deed in front of Kotter and Hedstrom, and that Hedstrom verbally assented to the handwritten changes as they were being made. (Pls' Amend. Resp. to Geldes's SOF ¶ 18.)

### B.      Breach of Fiduciary Duty Claim

Plaintiffs allege that Kotter breached the fiduciary duty she owed to Hedstrom by using her position as a broker to take title to the condominium units in her name and the name of the Kotter Family Trust.  To succeed on a claim for breach of fiduciary duty, a plaintiff must prove that:  (1) a fiduciary duty exists; (2) the fiduciary duty was breached; and (3) the breach proximately caused the injury complained of.  *Neade v. Portes*, 739 N.E.2d 496 (Ill. 2000). Kotter admits that as Hedstrom's real estate broker, she was his fiduciary and had a duty to represent his interests to the exclusion of her own.  Thus, the question for the Court is whether Kotter breached that duty and, if so, the breach proximately caused harm to Hedstrom's estate.

### 1.      The Presumption of Fraud

"Where the existence of a fiduciary relationship has been established, the law presumes that any transactions between the parties, by which the dominant party has profited, are fraudulent."  *Jones v. Washington*, 107 N.E.2d 672, 674 (Ill. 1952); see also *Kirkruff*, 697 N.E.2d at 411 (applying the presumption of fraud where a real estate broker entered into a contract with his principal).  Nevertheless, the presumption of fraud is "is not conclusive," and it "may be rebutted by clear and convincing proof that the dominant party has exercised good faith and has not betrayed the confidence reposed in him."  *Jones*, 107 N.E.2d at 674.  The beneficiary of the transaction – here, Kotter – bears "the burden of proving * * * that the transaction was fair and equitable and did not result from [her] undue influence over [Hedstrom]."  *In re Estate of Miller*, 778 N.E.2d 262, 267 (Ill. App. 5th Dist. 2002).

The presumption of fraud does not shift the burden of proof to the defendant fiduciary. See *Franciscan Sisters Health Care Corp. v. Dean*, 448 N.E.2d 872, 876 (Ill. 1983).  Rather, its effect is to establish a *prima facie* case of a breach and, if no contrary proof is offered, the

17

plaintiff will prevail. *Id.* If, however, the fiduciary is able to meet her burden of production with clear and convincing evidence that rebuts the presumption of fraud or undue influence, the presumption dissolves and "the burden of production shifts back to the plaintiff." *Id.* at 877; see also *In re Estate of Miller*, 778 N.E.2d at 267. At that point, the trier of fact simply "weigh[s] the evidence and consider[s] any and all reasonable inferences that can be drawn from [the] facts, including the possible inference" of fraud or undue influence. *Franciscan Sisters Health Care Corp.*, 448 N.E.2d at 878.[8]

Kotter cannot dispute the fact that she benefitted from the two transactions in which she served as a fiduciary. Nonetheless, Kotter argues that the presumption of fraud does not apply in this case. Kotter argues that as a real estate broker, her duties were limited to "the selection of the property, a determination of its value, and the negotiation of price * * *." (Def. Reply at 1.) Kotter acknowledges that she owed Hedstrom a fiduciary duty of "loyalty and competence" as to the category of duties that she could perform as a broker, but she contends that her duties could not extend beyond that scope. (Def. Reply at 2.) Thus, Kotter argues, because "she did not and could not" prepare the deed or the power of attorney that determined how title would be taken in this case, she was not Hedstrom's fiduciary for those tasks. Accordingly, she did not benefit by virtue of her fiduciary status. See *Estate of DeJarnette*, 677 N.E.2d 1024, 1029 (Ill. App. 4th Dist. 1997) ("[T]here is a presumption of fraud * * * where there is a fiduciary relationship between the parties and the fiduciary has benefitted by virtue of his fiduciary status.").

As an initial matter, notwithstanding her role as Hedstrom's real estate broker, Kotter became Hedstrom's fiduciary as a matter of law as to unit 1518 when Hedstrom signed the

---

[8] On cross motions for summary judgment, the Court must at all times draw inferences in favor of the non-moving party as it switches back and forth between the parties and their respective claims.

power of attorney giving Kotter the authority to act on his behalf at closing.  See, *e.g.*, *In re Estate of Miller*, 778 N.E.2d at 266 ("As a matter of law, a fiduciary relationship was established when [the defendant] obtained the power of attorney * * *."); *Lemp v. Hauptmann*, 525 N.E2d 203, 205 (Ill. App. 5th Dist. 1988) (citing *Apple v. Apple*, 95 N.E.2d 334, 338 (Ill. 1950)) ("[A] power of attorney creates a fiduciary relationship as a matter of law.").  The power of attorney explicitly granted Kotter the power to assign "[unit 1518] to the Kotter Family Trust dated September 25, 1993."  (Pls' Resp. to Geldes Mot. for Summary Judgment, Ex. 2.)  Where, as here, an "attorney-in-fact actively uses" her position to benefit, a presumption of fraud arises.  *Cf. In re Estate of DeJarnette*, 677 N.E. at 1029.  Thus, there is no question that the presumption of fraud applies to the way in which unit 1518 was titled.

In addition, Kotter takes too narrow a view of the fiduciary duties that a real estate broker owes to her principal.  A broker owes her principal general duties of good faith, loyalty, and trust.  *Kirkruff*, 697 N.E.2d at 411.  The relationship imposes a general duty on the fiduciary to refrain from 'seeking a selfish benefit during the relationship,'" see *Neade*, 739 N.E.2d at 500 (citation omitted), and it "requires full disclosure of all relevant facts relating to the transaction or affecting the subject matter of the agency."  *Kirkruff*, 697 N.E.2d at 411.  These duties continue if a broker, as an agent, engages in a transaction with her principal.  See *Letsos v. Century 21-New West Realty*, 675 N.E.2d 217, 226 (Ill. App. 1st Dist. 1996).  While it is true that as a broker, Kotter is not authorized to draft and attend to the execution of instruments relating to real-estate titles (see *Chicago Bar Ass'n v. Quinlan & Tyson, Inc.*, 214 N.E.2d 771, 775 (Ill. 1966)), that does not mean that Kotter is free to engage in self dealing where the title is concerned.  As Hedstrom's real estate broker, Kotter had a duty to put Hedstrom's interests above her own, and that duty extended to the way in which the units were titled.

19

Finally, even assuming that Kotter's position as a real estate broker did not give rise to a fiduciary duty relating to how the units were to be titled, the evidence demonstrates that an agency relationship existed between Kotter and Hedstrom that went beyond a typical real estate broker-client relationship and that specifically included the determination of how the condominium units would be titled. The summary judgment record shows that early in the transactions, Kotter made clear to Geldes that Kotter would be "answering all questions for [Hedstrom]." (Geldes Resp. to Pls' SOF ¶ 4.) Kotter was the one who communicated to Geldes how Hedstrom wanted the two units titled. She sent Geldes an e-mail in which she stated that unit 4705 should be titled to Hedstrom and Kotter as "joint tenants with rights of survivorship." (Pls' Amend. Resp. to Geldes SOF ¶ 12.) As for unit 1518, Kotter e-mailed Geldes instructing her that the unit should be titled to the Kotter Family Trust, and asked Geldes to prepare powers of attorney reflecting that fact. And although Geldes confirmed with Hedstrom the manner in which both units would be titled, all three parties understood that Kotter had the authority to act on Hedstrom's behalf in instructing Geldes how the units were to be titled. Although the question of whether an agency relationship exists is generally a question of fact, "if only one conclusion may be drawn from the undisputed facts," then a court may determine the issue as a matter of law. *Ioerger v. Halverson Const. Co. Inc.*, 902 N.E.2d 645, 648 (Ill. 2008). Here, the undisputed facts demonstrate clearly and convincingly that an agency relationship existed that included a determination of how the condominium units were to be titled. *Kirkruff*, 697 N.E.2d at 410 ("Whether an agency relationship exists may be established by circumstantial evidence, including the situation of the parties, their acts, and other relevant circumstances.").

Finally, Kotter argues that the presumption of donative intent that arises with the creation of a joint tenancy cancels out the presumption of fraud as to unit 4705. See *Murgic v. Granite*

20

*City Trust & Savings Bank*, 202 N.E.2d 470, 472 (Ill. 1964); *In re Estate of Miller*, 778 N.E.2d at 269 ("The formation of a statutory joint tenancy creates a presumption of donative intent, and a party claiming adversely has the burden of proving by clear and convincing evidence that a gift was not intended.")  In circumstances where the presumptions of fraud and donative intent conflict, the key question is whether the joint tenancy was formed before the fiduciary relationship.  See *In re Estate of Miller*, 778 N.E.2d at 270; *In re Estate of Teall*, 768 N.E.2d at 130.  If the joint tenancy was formed before the fiduciary relationship, the presumption of fraud is not as strong and the presumptions of fraud and donative intent "cancel each other."  *In re Estate of Miller*, 778 N.E.2d at 270 (citing *In re Estate of Harms*, 603 N.E.2d 37 (Ill. App. 4th Dist. 1992)).  If, however, the fiduciary uses her "position to create the joint tenancies[,] the presumptions do not cancel; instead, the controlling presumption is the presumption of fraud, which requires strong evidence to overcome."  *In re Estate of DeJarnette*, 677 N.E.2d at 1029. Here, because Kotter and Hedstrom's joint tenancy was created after Kotter had become Hedstrom's fiduciary, the presumption of fraud prevails over the presumption of donative intent.

In sum, because a fiduciary relationship existed between Kotter and Hedstrom either by law or by fact, Kotter owed Hedstrom a fiduciary duty to protect his interests to the exclusion of her own.  That duty extended to the entire transaction, including the determination of the manner in which the condominium units were titled.  Because Kotter benefitted from the two transactions, the Court reaffirms its prior determination that a presumption of fraud applies in this case, and that that presumption overrides any presumption of donative intent.

### 2.    Overcoming the Presumption of Fraud

As discussed above, to rebut the presumption of fraud, Kotter must demonstrate by clear and convincing evidence that she exercised good faith and did not betray the confidence that

Hedstrom placed in her. In determining whether a fiduciary has rebutted the presumption of fraud, Illinois courts look to three "significant" factors: (1) a showing that, before the transaction, the fiduciary made a full and frank disclosure of all relevant information; (2) the fiduciary paid adequate consideration for the transaction; and (3) the principal had competent and independent advice. See *Rizzo v. Rizzo*, 120 N.E.2d 546, 553 (Ill. 1954); see also, *e.g.*, *In re Estate of Teall*, 768 N.E.2d at 130; *In re Estate of Miller*, 778 N.E.2d at 267; *Kirkruff*, 697 N.E.2d at 411.

With the addition of Geldes's testimony, Kotter now has enough evidence to show that the transfer of title to Kotter "was the result of full and free deliberation on the part of [Hedstrom]." See *Lemp v. Hauptmann*, 525 N.E.2d 203, 206 (Ill. App. 5th Dist. 1988) (discussing a fiduciary's burden of proving that he received a gift from his principal). The undisputed evidence demonstrates that Hedstrom intended to give Kotter title to the two units as a gift, and that he did so knowing all of the relevant information and with the advice of an independent third party.

Under Illinois law, "[a] gift is a voluntary gratuitous transfer of property from donor to donee where the donor manifests an intent to make such a gift and absolutely and irrevocably delivers the property to the donee." *In re Estate of Poliquin*, 617 N.E.2d 40, 42 (Ill. App. 3d Dist. 1993). A valid gift requires proof, by clear and convincing evidence, of (1) donative intent, (2) acceptance, and (3) delivery. *In re Marriage of Link*, 839 N.E.2d 678, 680 (Ill. App. 2d Dist. 2005). Although the donor's own testimony is the most relevant evidence in determining donative intent, it is not the only relevant evidence. *In re Marriage of Didier*, 742 N.E.2d 808, 816-17 (Ill. App. 1st Dist. 2000). While a party's intent is a question of fact, the Illinois Appellate Court recently confirmed that a case in which a party's intent is a central issue may be

resolved on summary judgment "if the movant puts forward evidence as to a material fact that would entitle it to judgment and the nonmovant does not counter by pointing to contrary evidence." See *Borchers v. Franciscan Tertiary Province of Sacred Heart, Inc.*, No. 2-10-1257, --- N.E.2d ---, 2011 WL 6175766, at *7 (Ill. App. 2d Dist. Dec. 7, 2011).

Here, Geldes, an independent third party with nothing to gain from the transactions other than her legal fees (which she would get no matter how the units were titled), testified that she had a conversation with Hedstrom about how he wanted the two units titled. After explaining to Hedstrom the different options that he had for taking title jointly, and the legal implications of each option, Hedstrom told Geldes that he wanted title to both units to go to Kotter upon his death. He stated that he wanted Kotter to have title to the units so that she would be taken care of when he died. In other words, he intended to give the units to Kotter.

Other evidence put forth by Kotter also supports the fact that Hedstrom wanted Kotter to have title to the two units when he died, and that he made that decision knowingly and with independent advice. Hedstrom strongly objected to the original contract modification letters, and told Geldes by e-mail that he wanted Kotter to share in the title for the two units. This shows both that Hedstrom read the e-mails and attachments that Geldes was sending him and that he adamantly wanted Kotter on the title to the units in some fashion. Specifically as to unit 4705, Geldes e-mailed Hedstrom the revised contract modification letter that stated that the unit would be titled to Hedstrom and Kotter as joint tenants with rights of survivorship. Hedstrom did not object to the revised letter, even after Geldes had explained to him directly what it meant to take title to property as joint tenants with rights of survivorship. Hedstrom also attended the closing for the unit and gave his verbal assent when Geldes hand wrote "with rights of survivorship" into the deed.

23

Plaintiffs claim that the provision in Hedstrom's will that calls for his trustee to sell unit 4705 upon his death at least raises an issue of fact as to whether unit 4705 was titled as Hedstrom intended. But the disposition of the unit in Hedstrom's will does not conflict with the way that the unit was titled. As joint tenants with rights of survivorship, Hedstrom and Kotter both received a "present estate," with each being "seized of the whole," and the last surviving joint tenant took "the whole of the estate." See *Snyder v. Heidelberger*, 953 N.E.2d 415, 420 (Ill. 2011). Thus, if Kotter had predeceased Hedstrom, he would have taken full title of the unit and it would have made sense to provide for its sale in his will. The fact that Hedstrom provided for unit 4705 in his will, but not for unit 1518, supports the fact that he was well aware of the legal implications of how each was titled. Hedstrom absolutely and irrevocably delivered his gift of unit 4705 at closing when he signed the deed, and Kotter accepted it at that time. Kotter has provided clear and convincing evidence that Hedstrom intended to give Kotter full title to unit 4705 upon his death and that he did so with all of the relevant information and with competent, independent advice.

As for unit 1518, Plaintiffs are correct that Hedstrom's signature on the power of attorney is not enough to rebut the presumption of fraud; rather, Kotter must show that Hedstrom gave title to the Kotter Family Trust "with full knowledge of the facts, including knowledge of the legal effect of his signature on the relevant documents." See *Prueter v. Bork*, 435 N.E.2d 109, 113 (Ill. App. 1st Dist. 1981). But Kotter has presented more than just the document itself. After Kotter relayed the change in title to Geldes, Geldes sent to Hedstrom by fax and e-mail a power of attorney that would give Kotter the power to, among other things, assign unit 1518 to the Kotter Family Trust. In her e-mail describing the document, Geldes stated that, "[t]he power of attorney assigns the rights under the contract to the Kotter Family Trust. The Kotter Family

24

Trust will own the property not Don and Cherie as joint tenants." (Pls' Resp. to Geldes Mot. for Summary Judgment, Ex. 2.) Geldes also called Hedstrom to confirm the title change, but was unable to reach him and left a voice message.

As discussed earlier, Hedstrom read his e-mails and the documents attached to those e-mails, and demonstrated that if he disagreed with something, he would not hesitate to voice his displeasure in no uncertain terms. Hedstrom signed the power of attorney that specifically authorized Kotter to act on his behalf in titling unit 1518 to the Kotter Family Trust, and he did so with the advice and counsel of an independent third party. That is enough to demonstrate, by clear and convincing evidence, that Hedstrom had all of the relevant facts and received competent independent advice before granting Kotter the power of attorney and title to unit 1518.

Although Kotter may not testify herself as to the conversations that she had with Hedstrom, she has presented sufficient evidence to demonstrate that Hedstrom gave her title to the two units as a gift and that he did so knowing all the relevant facts and with independent and competent advice.[9] She has shown that the transactions were fair, were conducted in good faith, and that she did not benefit from her position by keeping Hedstrom uninformed. Accordingly, Kotter has rebutted the presumption of fraud.

---

[9] Plaintiffs argue that Geldes's advice was not competent because it had adverse tax implications for the estate. However, to rebut the presumption of fraud, Kotter does not have to show that Geldes instructed Hedstrom to title the units in the most tax-effective way. Kotter simply has to demonstrate that someone other than Kotter herself spoke to Hedstrom about his decision and made sure that he understood the consequences of that decision – specifically, how Kotter would benefit from his decision.

###     3.     Breach of Fiduciary Duty

Because Kotter has introduced sufficient evidence "contrary to the presumption, the bubble bursts and the presumption vanishes." See *Franciscan Sisters Health Care Corp.*, 448 N.E.2d at 877. That leaves Plaintiffs with both the burden of production and the burden of proof in this case. *Id.* at 876 (stating that the presumption of fraud does not shift the burden of proof). As Plaintiffs point out in their motion for reconsideration, in determining whether either party has raised a genuine issue of fact that is sufficient to withstand summary judgment, the Court "'view[s] the evidence presented through the prism of the substantive evidentiary burden.'" *Ass'n Benefit Servs., Inc.*, 493 F.3d at 854 (quoting *Anderson*, 477 U.S. at 254).[10] Here, the Court concludes that the evidence that Plaintiffs have submitted is not enough to raise a disputed issue of material fact as to whether Kotter breached her fiduciary duty to Hedstrom. Without any evidence supporting their position, Plaintiffs have argued that the two units were not titled as Hedstrom intended, or that Hedstrom did not understand the consequences of titling the units the way they were titled. With the addition of Geldes's testimony, however, the undisputed evidence shows otherwise. Despite having had numerous opportunities – in their original cross motion for summary judgment, their response to Geldes's and Kotter's original cross motions for summary judgment, their motion for reconsideration and renewed cross motion for summary judgment, and their response to Kotter's motion for reconsideration and renewed cross motion for summary judgment[11] – Plaintiffs have not come forward with evidence upon which a jury

---

[10] Because the Court applied the correct standard for resolving a motion for summary judgment in its October 18, 2010 opinion, it denies Plaintiffs' motion for reconsideration [161].

[11] Plaintiffs cannot argue that, believing that the Illinois Dead-Man's Act applied, they made a strategic decision to withhold any additional evidence that they have as to Hedstrom's intent. Assuming that such evidence exists, Plaintiffs had notice after the filing of Kotter's motion for reconsideration and renewed

could reasonably find in their favor.  See *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (quotation omitted) (stating that "summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events").  Accordingly, the Court grants Kotter's renewed motion for summary judgment as to Plaintiffs' claims against Kotter and the Kotter Family Trust [152] and denies Plaintiffs' renewed motion for summary judgment on those same claims [161].

## IV.    Conclusion

For the foregoing reasons, the Court (1) grants Kotter's motion for reconsideration and renewed cross motion for summary judgment [152]; (2) denies Plaintiffs' motion for reconsideration and renewed cross motion for summary judgment [161]; and (3) denies the parties' remaining motions [163, 165-171, 173-74, 176-77] as moot.  The Court will enter a final judgment in favor of Kotter and Geldes and against Plaintiffs on all claims.

Dated: March 22, 2012

_____
Robert M. Dow, Jr.
United States District Judge

---

cross motion for summary judgment that the Court would be reviewing its ruling as to the admissibility of Geldes's testimony and that a decision in Kotter's favor could affect her ability to rebut the presumption of fraud.  The time for addressing the possible consequences of such a ruling – and bringing forward any and all evidence in their favor and against Kotter's contentions – was in Plaintiffs' response to Kotter's motion.